Judge McMahon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X
                            :

UNITED STATES OF AMERICA          :   **INFORMATION**

     - v. -                 :   22 Cr.

ALLIANZ GLOBAL INVESTORS U.S. LLC,   :

          Defendant.     :

                            :

- - - - - - - - - - - - - - - - - - X

**22 CRIM 279**

## COUNT ONE

### (Securities Fraud)

The United States Attorney charges:

### Overview of the Scheme

1.    Beginning in at least 2014 up to and including in or about March 2020, Allianz Global Investors U.S. LLC ("AGI US"), the defendant, engaged in a scheme to defraud investors in a series of private investment funds (collectively, the "Structured Alpha Funds," or the "Funds") that, at their height, had over $11 billion in assets under management.[1] The scheme was carried out by, among others, the three portfolio managers with primary responsibility for managing the Structured Alpha Funds, specifically, Gregoire Tournant, Trevor Taylor, and Stephen Bond-Nelson (the "Portfolio Managers"). The investors that were

---

[1] In addition to the Structured Alpha Funds, AGI US also engaged in a scheme to defraud the sole investor in a UCITS fund in a similar manner as described below.

the victims of the scheme included, among others, pension funds for teachers, religious organizations, bus drivers, and engineers. In particular, AGI US made false and misleading statements to current and prospective investors that substantially understated the risks being taken by the Funds, and also overstated the level of independent risk oversight over the Funds. AGI US also failed to disclose and sought affirmatively to withhold relevant risk information. AGI US did this in violation of its fiduciary duties as an investment adviser, including its duty of care and its duty of loyalty.

2.    The misconduct occurred only within the small Structured Products Group at AGI US, the defendant.   The Government's investigation has not revealed evidence that anyone at AGI US outside of the Structured Products Group was aware of the misconduct before March 2020. The investigation also has not revealed that anyone at any other organizations that fell within the broader umbrella of the parent company Allianz SE was aware of or participated in the misconduct.

3.    The compliance and risk management functions at AGI US, the defendant, failed to maintain adequate oversight of the team managing the Structured Alpha Funds, despite AGI US's representations to investors that it had designed and maintained an independent risk management function to monitor and manage risk, as set forth more fully below. The Portfolio Managers were

able to take advantage of these control failures to manage the Funds in a manner inconsistent with representations to investors.  The control failures also facilitated the Portfolio Managers' actions to deceive investors by hiding, and making affirmative misstatements about, risk over the course of years. The investigation has not revealed evidence that these control failures occurred within any other organizations that fall within the broader umbrella of the parent company Allianz SE.

4.    As a result of the fraudulent scheme, the performance of the Funds, and therefore the profits that flowed to AGI US, the defendant, and up to its parent companies, were inflated, as was the compensation paid to the Portfolio Managers.

5.    After the severe market dislocations following the onset of the COVID-19 pandemic in March 2020 (the "COVID Crash"), the Funds collectively lost more than $7 billion in value, some faced margin calls, and the Funds were ultimately shut down. During this time, investor victims lost over $3.2 billion in principal.

### Relevant Parties and Corporate Structure

6.    AGI US, the defendant, is an investment adviser registered with the United States Securities and Exchange Commission ("SEC") and headquartered in New York City. AGI US is an indirect, wholly owned subsidiary of Allianz SE, one of the world's largest financial services companies and one of the

world's largest insurance companies.  Allianz SE is headquartered in Munich, Germany and its stock trades on the Frankfurt Stock Exchange. As of September 2019, AGI US had 291 employees and approximately $126 billion in assets under management across a variety of funds.

7.    The Structured Products Group was one group within AGI US, the defendant, and by 2020 it had eleven employees, with over $11 billion in assets under management across the 17 different Structured Alpha Funds. The Funds all generally followed a similar strategy, comprised of one component (called the "beta" component) that sought to deliver a return to investors equivalent to a specified benchmark index, such as the S&P, and a second component (called the "alpha" component) that involved a complex strategy of using options designed to deliver additional returns above the "beta" component, regardless of whether the benchmark index rose or fell. The "alpha" options strategy of the Funds was marketed to investors as including hedging positions to protect against an overnight or short-term equity-market crash.

8.    The Structured Products Group was led by Gregoire Tournant ("Tournant"), a dual French-American citizen who resided in New York and then Florida and who served as the Chief Investment Officer of the Structured Products Group. Tournant also sat on the AGI US Executive Committee from March 2017

4

through 2019, until the Committee was dissolved. From 2015 through 2019, Tournant was either the highest or second-highest compensated employee of AGI US.

9.     Tournant was assisted in managing the Structured Alpha Funds by fellow portfolio managers Trevor Taylor ("Taylor") and Stephen Bond-Nelson ("Bond-Nelson"). Tournant was also assisted by the lead product specialist for the Structured Products Group ("Product Specialist-1"), who was responsible for explaining the investment strategy to clients.

### The Fraudulent Scheme

10.    AGI US, the defendant, repeatedly represented to investors in marketing materials for the Structured Alpha Funds that risk was "continuously managed and monitored at both the portfolio level by the investment team and the firm level," and that the Funds had a specific set of hedging positions in place to protect against an overnight or short-term equity-market crash. Indeed, Tournant told certain investors that the Funds' managers considered themselves "risk managers first, return managers second." Despite these representations, however, AGI US, through the Portfolio Managers acting at the direction of Tournant, deployed an investment strategy that prioritized returns over effective risk management. The Portfolio Managers repeatedly failed to purchase the hedging positions that investors were promised.  Further, the Portfolio Managers

managed the funds belonging to their largest investor to higher risk targets than promised. Last, in many instances, when investors asked for documentation to assess the true risks of the portfolio and to guide their investment decisions, the Portfolio Managers fraudulently altered the data that was provided to investors in a way that consistently understated the magnitude of the risk to which the investors were exposed.

11.    The fraudulent scheme was carried out in the following ways:

a.    **Hedging:** The Funds' options strategy had three main components: (a) range-bound spreads; (b) directional spreads; and (c) hedging positions. Beginning in October 2015, AGI US, the defendant, consistently represented to investors in marketing materials that it would purchase hedges for the Funds that were -10 to -25% "out of the money" to protect the portfolio against an overnight crash, as well as a short-term equity-market crash, typically defined as a decline of 10 to 15% in less than 5 days. In fact, beginning in approximately late 2015, AGI US, at Tournant's direction, began purchasing certain hedges called "tail risk hedges" for the Funds closer to -10 to -45%, and at one point in 2018, as much as 66% out of the money. Indeed, beginning in February 2018, tail risk hedges were purchased at strike prices that averaged between -30 to -50% out

of the money. These further out of the money hedges were cheaper but also less protective in the event of a market downturn.

b.   **Open Position Worksheets:** Tournant and Taylor altered open position worksheets, which showed each position in the portfolio, before certain investor meetings. Specifically, before meetings, Tournant and Taylor manually changed the worksheets to bring the strike distances of the hedges closer to the money. Because hedges that are closer to the money are worth more in a market decline, these alterations made the portfolio seem better hedged against a market downturn, and therefore less risky. Relatedly, these alterations concealed that AGI US, the defendant, had abandoned its promise to maintain hedges in the Funds with strike distances in the range of -10 to -25% out of the money. For example, in one instance Taylor altered a spreadsheet to change a hedge's strike distance from -45.01 to -24.71%. Tournant also, on at least one occasion, simply removed certain positions from the open positions worksheet that he intended to show to an investor. These changes had the effect of making the portfolio appear lower risk than it actually was.

c.   **Position Data:** On at least one occasion, Tournant manually altered holdings data that was sent to one potential investor, who ultimately invested. After the potential investor requested holdings data for a certain fund, Tournant took the accurate holdings data and changed 31 of the fund's 576 open

positions from short positions to long positions, and then sent
this fraudulent data to the potential investor.  Tournant made
these changes by altering both the quantity of the positions as
well as the internal descriptive codes – for example, from
"short puts" to "tail risk hedges."  The overall effect of
Tournant's changes was to fraudulently show a portfolio that was
more protected against risk than the fund's actual portfolio.

d.  **Risk Reports:** Risk reports were daily reports created
by the Investment Data Services GmbH – Analysis and Reporting
Services ("IDS"), an affiliate of AGI US that was independent
from the Structured Products Group. Unlike the Portfolio
Managers, whose compensation was directly tied to the quarterly
performance of the Funds, the compensation of IDS employees was
not tied to the Funds' performance. This independence was a
feature that AGI US marketed to investors and was important as a
protection against risk. IDS provided daily risk reports for the
Funds that included "stress tests," which modelled the impact of
various one-day changes in the market on the Fund. In many
instances, these risk reports were sent to certain investors
when those investors requested such reports. However,
unbeknownst to these investors, who believed that they were
getting the risk reports created by IDS, Tournant and Bond-
Nelson altered over 75 risk reports that went to six investors,
as well as to four consultants that advised approximately 35

additional investors. Tournant and Bond-Nelson altered these risk reports by, among other things, manually changing certain "stress test" results to make it appear that in significant one-day market downturns, the Funds would lose less money. For example, on one occasion, Bond-Nelson took a projected loss of -30.82%, and cut it in half, to -15.41%. On another occasion, Bond-Nelson took a projected loss of -30.95% and simply reduced it by 20, to a much lower projected loss of -10.95%. The altered reports were then falsely presented to some investors as independently created reports generated by IDS, without disclosing the alterations.

e.   **Greeks:** Tournant and Bond-Nelson altered the "Greeks" that went to some investors. The Greeks are metrics that provide measures of risk associated with options positions. In general, these alterations were done to make the Funds appear less sensitive to market changes. Dozens of altered Greeks were sent to approximately nine investors and six consultants that advised approximately 35 additional investors.

f.   **Performance Data:** Tournant, Bond-Nelson, and in one case other members of the Structured Products Group, altered daily performance data that went to at least three investors by "smoothing" the data to reduce the magnitude of the largest losses as well as the gains on surrounding dates as a counterbalance. This made it appear as though the Funds were

less responsive to market downturns, and therefore less risky in the event of such a downturn. As an example of this smoothing, in or about July 2016, Tournant directed members of the Structured Products Group to send daily performance data that he had smoothed to an investor in the Funds. As one example of the smoothing in this data sent, Tournant changed the daily performance number for August 24, 2015, a notable market downturn, from -18.26% to -9.26%. This made the Funds appear less sensitive to the late August 2015 market volatility.

g.   **Attribution Data:** Tournant altered certain attribution data that showed the portfolio's gains and losses attributed to the three prongs of the strategy, to make it appear as though the portfolio had more significant hedging positions than were in fact in place.

h.   **Expected Value Sheets:** Tournant and Taylor changed expected value ("EV") sheets that were shown to certain investors during meetings, so that the potential losses on certain positions appeared smaller. EV sheets predicted how the different positions in the Funds' portfolio could perform if the market went up or down by a specific percentage. They were shown to certain investors during client meetings, as one example of how the portfolio managers monitored the portfolio and associated risk. In certain market movements, EV sheets showed that certain positions were projected to lose significant

amounts of money. Tournant and Taylor manually altered certain EV sheets to decrease projected losses that they felt appeared too large. Consistent with the other types of alterations described above, the alteration of EV Sheets understated the magnitude of the downside risk of the strategy.

      i.   **Variable Alpha Target Funds:** AGI US, the defendant, entered into an agreement with the Funds' largest investor ("Investor-1") for "variable alpha target" funds – in other words, funds whose alpha targets would vary based on the market volatility at the time. The agreement originally provided that in a lower-volatility situation, the variable alpha target funds would be managed using a lower alpha target; in a higher-volatility situation, a higher alpha target would be used. This was designed in part to reduce Investor-1's exposure to downside risk. Rather than adhere to this agreement, during much of the relevant time Tournant managed Investor-1's funds to a higher alpha target than agreed upon. Tournant did not disclose this to Investor-1, but instead showed Investor-1 fraudulent reports during meetings that showed the variable alpha funds being managed to a lower alpha target than was in fact the case. Tournant also circulated similarly fraudulent reports internally

at AGI US. This deviation in strategy exposed Investor-1 to greater financial risk than Investor-1 had agreed to assume.

12.   While AGI US, the defendant, did not charge a management fee, it did charge a 30% performance fee, calculated as 30% of each Fund's quarterly returns in excess of the relevant benchmark index, subject to a cumulative high water mark at the client account level. The Structured Products Group received a share of the performance fees. Tournant and Taylor received the largest share, each receiving $13 million in compensation in 2019. As noted above, from 2015 through 2019, Tournant was either the highest or the second-highest paid employee at AGI US. As a result of this compensation structure, the Portfolio Managers earned higher pay by taking greater risk with the Funds' money to generate larger performance fees.

**Failure of AGI US to Provide Meaningful Oversight of Structured Products Group**

13.   As noted above, the criminal acts committed by AGI US, the defendant, were perpetrated by a handful of employees within AGI US's Structured Products Group. The Portfolio Managers concealed their misconduct and repeatedly violated AGI US's policies and procedures. At the same time, the Portfolio Managers were able to carry on the fraud for years, in part, because AGI US lacked sufficient internal controls and oversight for the Funds. This is despite the fact that the Structured

Products Group contributed approximately one-quarter of AGI US's revenue during at least 2016 through 2019.

14.    AGI US, the defendant, assured investors in marketing materials that risk was "continuously managed and monitored at both the portfolio level by the investment team and at the firm level." AGI US described itself as having "three lines of defense": (i) the business, including portfolio management and sales; (ii) Enterprise Risk Management ("ERM"), Compliance and Legal departments; and (iii) an Internal Audit function. In a 2014 meeting, Tournant falsely told one investor that the Funds had "very strict controls" and described AGI US's parent company, Allianz, as a "master cop," noting that he had "behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from legal, compliance, and risk standpoint that I'm well within the guidelines . . . which is very, very different than if I had my own hedge fund firm, where in some form or fashion I can overrule just about anything."

15.    Despite these representations, there were significant gaps and weaknesses in AGI US's controls as they related to the Funds. Although communicating accurately and candidly with investors is a core duty of an investment advisor, the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha

13

Funds was being monitored in line with what investors had been told. Specifically, no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised Investor-1, despite the fact that the materials containing these representations were reviewed and approved by the AGI US Legal and Compliance departments. Further, client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance. Indeed, Compliance, ERM, and Legal were unaware that many of the reports described above were being sent to investors at all, with or without alterations. The Portfolio Managers thus were able to employ more aggressive investment strategies than they had told investors they would employ and thereby exposed investors to undisclosed risk. The ability of the Portfolio Managers to deviate from the representations that had been made to investors was possible, in part, because of fundamental failures in AGI US's controls as they related to the Funds. AGI US should have designed these controls to prevent the portfolio managers from putting their interests above those of their clients.

16.  Additionally, neither ERM nor any other independent function was tasked with monitoring whether AGI US, the defendant, was adhering to its representations to investors in

the management of the Funds. For example, no risk or compliance personnel were responsible for confirming that AGI US was maintaining hedges for the funds within the -10 to -25% range that was represented to investors. As another example, risk and compliance personnel did not monitor the Funds' adherence to the alpha targets promised to Investor-1, the Funds' largest investor, even though compliance and legal personnel were aware of the Funds' undertakings with respect to Investor-1's alpha targets. Because no one in the control function at AGI US was verifying that investors were getting the risk mitigation they had been promised, Tournant was able to deceive investors regarding their risk exposure, exposing the Funds to much greater risk than what was promised to investors.

17. AGI US advertised to investors that an "independent enterprise risk management function" operated as the second line of defense and provided "independent portfolio risk oversight." AGI US also advertised to investors that the independent ERM function was providing this oversight by, among other things, monitoring daily risk reports created by IDS, an "independent service provider." However, in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors. Investors were thus misled regarding the independence of certain

risk reports that they received.  Because AGI US's controls system did not review existing client reporting at all, AGI US failed to detect that individuals at the Funds were sending these reports to investors, much less that they were sending altered reports.

18.  As to audits, the third line of defense, Internal Audit conducted an audit of the Structured Products Group in 2017. Although that audit identified red flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted. Specifically, in 2017 an internal audit of the Structured Products Group identified certain inaccuracies in pitch books, namely, outdated references to certain risk metrics. Although the audit report "highlighted the need to thoroughly review marketing materials to ensure that the disclosure language[] accurately reflect the on-going investment processes," the audit did not trigger a review of the accuracy of the representations in investor materials by anyone outside the Structured Products Group. Instead, Internal Audit assigned that review to the product specialists within the Structured Products Group, whose compensation was directly tied to the quarterly performance of the Funds. Had an independent review occurred, AGI US's control

function could potentially have uncovered at least the misrepresentations regarding the hedging positions.

19.  AGI US's failure to address data quality issues in back-office functions, in part, allowed the Portfolio Managers' fraud to continue undetected. Multiple AGI US employees within the Structured Products Group who were not directly involved in the fraudulent scheme were aware that Tournant and Bond-Nelson were altering numbers on certain reports before sending them to investors. To cover up their wrongdoing, Tournant and Bond-Nelson explained to their fellow employees in the Structured Products Group that they were simply correcting "errors" in reporting generated by back-office functions. Because there were, in fact, ongoing issues with the back office's data reporting, multiple members of the Structured Products Group who might otherwise have reported the fraudulent scheme instead accepted this (fictional) explanation, and carried on with their work.

20.  AGI US's insufficient oversight over the Funds' adherence to capacity limits also contributed to investor losses due to the scheme. Although the Portfolio Managers were required to provide capacity reports to the AGI US Product Committee on a quarterly basis, the Committee did not exercise meaningful oversight over the Funds' adherence to capacity limits. For example, despite reporting assets under management that exceeded

the Funds' capacity limits, the Product Committee never recommended that the Funds reduce capacity or stop accepting additional investments. Further, although the Product Committee had closed certain funds to new investors because of capacity limits, Tournant nonetheless permitted new investors to invest in those funds. In effect, Tournant, the Chief Investment Officer of the Structured Products Group, whose compensation was directly tied to the quarterly performance of the Funds, exercised discretion and decision-making authority over the Funds' capacity limits, including increases to those limits.

21.   AGI US, the defendant, learned in approximately March 2020 that risk reports had been altered and sent to investors. The SEC thereafter began an investigation. When AGI US's lawyers sought information about these alterations so that AGI US could provide that information to the SEC, Tournant directed Bond-Nelson to lie to AGI US's lawyers and Bond-Nelson did so. The SEC later independently discovered certain of the alterations, as well as their fraudulent nature, during its own investigation, months later.

## Statutory Allegation

22.   The allegations contained in paragraphs 1 through 21 of this Information are repeated and realleged as if fully set forth herein.

23.   From at least in or about 2014 through in or about 2020, in the Southern District of New York and elsewhere, AGI US, the defendant, together with others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, AGI US and others known and unknown engaged in a scheme to defraud investors in the Structured Alpha Funds by making false and misleading statements to current and prospective investors that substantially

understated the risks being taken with respect to the Funds'
investments.

> (Title 15, United States Code, Sections 78j(b) & 78ff;
> Title 17, Code of Federal Regulations, Section
> 240.10b-5; Title 18, United States Code, Section 2.)

### FORFEITURE ALLEGATION

24.  As a result of committing the offense charged in Count
One of this Information, AGI US, the defendant, shall forfeit to
the United States, pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code, Section
2461, all property, real and personal, that constitutes or is
derived from proceeds traceable to the commission of said
offenses, including but not limited to a sum of money in United
States currency representing the amount of proceeds traceable to
the commission of said offenses that the defendant personally
obtained.

### Substitute Assets Provision

25.  If any of the above-described forfeitable property, as
a result of any act or omission by the defendant:

a.    cannot be  located  upon  the  exercise  of  due
diligence;

b.    has been transferred or sold to, or deposited with,
a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

    (Title 18, United States Code, Section 981(a)(1)(C);
     Title 21, United States Code, Section 853(p);
     Title 28, United States Code, Section 2461.)

DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

Allianz Global Investors U.S. LLC,

Defendant.

INFORMATION

22 Cr. _____

(Title 15, United States Code, Sections
78j(b), 78ff; Title 17, Code of Federal
Regulations, Sections 240.10b-5; and Title 18,
United States Code, Section 2.)

DAMIAN WILLIAMS
United States Attorney